EMILINE CHIDESTER, Appellee, v. FRANK HARLAN et al., Appellees, VAN V. BALDWIN, Intervener, Appellant.

IN RE ESTATE OF A. W. HARLAN, Deceased.

**WITNESSES:** Competency—Transaction with Deceased—Inferable
**1 Facts.** Conceding, *arguendo*, that one incompetent to testify to a personal transaction or communication with a deceased is competent to testify to nonprohibited facts, from which, by inference, other facts may be found, even though the fact found

by inference be a fact to which the witness is not competent to testify to directly, yet such principle does not embrace the right of such witness *to testify to the contents of an instrument* constituting a personal communication between deceased and said witness.

PRINCIPLE APPLIED:   An heir received certain property under an agreement that he would receive the same in full of his interest in the grantor's estate.   After the death of grantor, the heir claimed that, subsequent to the deeding of the land to him, the grantor executed to him another writing, which, in effect, canceled the agreement that the heir should receive the land in full of his share in the estate, and reinstated him as an heir along with other heirs.   This heir testified, over objection:

1. That, after the deeds were delivered to him, he had another paper in his possession.

2. That said paper was not delivered to him by any person other than the said deceased.

3. That the paper was in the handwriting of said deceased.

. *Held* that, conceding the above to be unobjectionable under ·Sec. 4604, Code, 1897, yet the witness was incompetent to testify *as to the contents of the writing.*

**DESCENT AND DISTRIBUTION:**   Advancements—Cancellation Agreement—Sufficiency of Evidence.   Strongly contradictory evidence reviewed, and held insufficient to establish the making of an agreement canceling an advancement made in full of the heir's interest in an estate.

**EVIDENCE:**   Best and Secondary—Loss of Writing—Sufficiency of Showing.   Evidence reviewed, and held, at the best, to be very unsatisfactory on the question of the loss of a written instrument.

**EVIDENCE:**   Declarations—As Showing Intent and Purpose on Issuable Fact.   When the very issue is whether· a deceased party *did* do a certain act, i. e., execute a certain alleged instrument, the declarations of such party showing his intent and purpose not to do, or inconsistent with the doing of, such alleged act, made prior or subsequent to the time when it is *alleged* that he did such act, are competent as bearing on whether he actually did said act.

PRINCIPLE APPLIED: . An heir received deeds to certain property, under an agreement, in the deeds, to accept the same in full of his prospective share in grantor's estate.   After gran-

tor died, the heir claimed that, some years subsequent to the execution of said deeds, the grantor executed another instrument, in effect canceling the agreement that the said conveyances should be in full of the grantee's interest in grantor's estate. The said grantor died several years after the date of this last alleged instrument. Issue was raised on the execution of this last alleged instrument. *Held*, the declarations of the grantor both prior and subsequent to the date of said *alleged* last instrument, *consistent with the agreement in the said original deeds and inconsistent with the execution of said last alleged instrument*, were competent as bearing on whether such last instrument *was* executed.

EVIDENCE: Presumptions—Inconsistent Conduct—Effect. Principle recognized and applied that the long-continued and unexplained failure, under urgent circumstances, to make known the existence of an instrument conferring a valuable right on the grantee, furnishes persuasive evidence that such instrument never in fact validly existed.

EVIDENCE: Weight and Sufficiency—Inherent Improbability. Principle recognized that the inherent improbability of testimony may destroy it, even though, in a technical sense, it may be said that such testimony is undisputed.

*Appeal from Lee District Court.*—W. S. HAMILTON, Judge.

SATURDAY, OCTOBER 21, 1916.

REHEARING DENIED MONDAY, JUNE 18, 1917.

ACTION in partition. Decree in the court below affirmed.—*Affirmed.*

*Hughes & McCoid,* for appellant.

*John E. Craig, Lutz & Jordan, Hollingsworth & Blood* and *Archer C. Miller,* for appellees.

GAYNOR, C. J.—This is a suit in equity to partition real estate. The parties to the action are the children and grandchildren of one A. W. Harlan, deceased, who was the owner of the property during his lifetime. The suit is brought by his daughter, Mrs. Emiline Chidester. Frank Harlan, a

son, and Vivian C. Harlan, intervener, joined with Emiline Chidester in her prayer for partition. These three, under the record now made, claim to be the sole owners of the property in controversy, and each claims to own an undivided one-third interest therein. Frank Harlan is a son of deceased's. Vivian C. Harlan is a son of Albert Harlan's, deceased, who was a son of A. W. Harlan's, deceased. Mark T. Harlan is a grandson of A. W. Harlan's, deceased, and is the only son and heir of Justin B. Harlan, who died on April 20, 1890. In this partition suit, as it was tried and submitted to the court, the claim was made by this daughter, Emiline Chidester, Frank Harlan, and the grandson, Vivian C. Harlan, that Mark T. Harlan had no interest in the land to be partitioned, and no right to participate in the proceeds of the land, for the reason that, prior to the death of A. W. Harlan, he had executed and delivered to Mark two deeds, one in 1896, conveying to Mark 65 acres of land, and another in 1901, conveying to him 33⅓ acres of land, in full of any claim which he might have as heir of A. W. Harlan. The deeds referred to contained this clause:

"For the consideration of natural affection and full release of all claims against me or my real estate, as the only heir of my son Justin B. Harlan, or otherwise, I, A. W. Harlan, hereby sell and convey to my grandson, Mark T. Harlan [Here follows a description of the property].

"Grantee herein accepts said land for the consideration herein named, and covenants to make no claim as above stated."

Mark T. Harlan accepted these deeds with this covenant in them, and thereafter sold the land. It is claimed by these contesting heirs that, by accepting this conveyance with the covenant, Mark T. Harlan released all his claim to his grandfather's estate, and is not, therefore, upon his death, entitled to participate in his estate, or to share in

the real estate left by the said A. W. Harlan, deceased.   It
is conceded that, if nothing more appeared, Mark T. Harlan
would not have any interest in the real estate involved in
the partition suit, and would not be entitled to a share in
the proceeds, and that his assignee, the intervener Van V.
Baldwin, has no greater right than Mark would have.   Bald-
win, however, claims, in his petition of intervention, that
A. W. Harlan, during his lifetime, made gifts to the other
heirs, and that, subsequent to September, 1904, he modi-
fied and changed the conditions in the deeds to Mark T. Har-
lan referred to in the petition, and made the land therein
described a gift to Mark, and that Mark was thereafter to
take his father's share in the estate of his grandfather, up-
on the grandfather's death; that this was evidenced by a
writing signed by A. W. Harlan and delivered by him to
Mark; that this instrument was dated on election day in
November, 1904.   It was claimed upon the trial that this
modifying instrument was lost, could not be, and was not,
produced upon the trial.   Evidence was offered tending
to show its loss, or at least that it could not be found, and
an attempt made to give to the court the substance of its
contents, though no one attempted to state its contents
verbatim, or to state substantially its contents in the words
of the instrument.   It is claimed that this instrument was
lost about December, 1910.   A. W. Harlan died April
30, 1911, and was at the time over 90 years of age.   The de-
cision in this case involves the sufficiency of the competent
evidence to sustain this claim of the intervener's.   It is
contended that much of the evidence offered to support
intervener's contention was given by witnesses who were
incompetent to testify, under Section 4604, Code, 1897,
and that there was insufficient competent evidence to sus-
tain the intervener's claim.   In the court below intervener's
petition was dismissed, and intervener alone appeals.

Two questions are presented: First, Was the paper

alleged to have been executed and delivered to Mark T. Harlan on election day in 1904 in fact executed and delivered to him by A. W. Harlan? Second, Was this paper lost, so that its contents could be proven by parol?

We will first determine from this record whether or not it is proven by competent evidence, or by the mouths of competent witnesses, that such a paper as the one relied upon by intervener was ever in fact executed and delivered by A. W. Harlan to Mark T. Harlan; second, whether this paper was proven to have been lost or mislaid, so that its contents could be proven by parol; third, if proven to have been executed and lost, whether or not the contents of the instrument have been shown by competent evidence, and, if so shown, the effect of the execution and delivery of the instrument upon the rights of Mark T. Harlan to participate in his grandfather's estate, notwithstanding the provisions of the deed hereinbefore referred to.

It is conceded that Mark T. Harlan is an incompetent witness to testify to personal transactions between himself and the deceased, because he is the person through whom the intervener received whatever right, title or interest he has in the estate of A. W. Harlan. He was called as a witness by the intervener, and was asked these questions:

"Q. You may state whether or not you had a paper with reference to your interest in his estate in your possession after the summer of 1904. A. I had. Q. In whose handwriting was it? A. A. W. Harlan's. Q. What became of the paper? A. It became mislaid or lost. I have not been able to find it, anyhow. Q. How long was it in your possession? A. About six years that I know of."

Then he was asked these questions:

"You may state whether or not this paper (not referring to any personal transaction with your deceased grandfather, A. W. Harlan) was given to you by someone.

A. It was. Q. You may state whether or not this paper (not referring to any personal transactions between yourself and A. W. Harlan) was given to you by any person other than A. W. Harlan. A. It was not. Q. You may state, as nearly as you can, the contents of that paper. A. This paper was to me, and said A. W. Harlan had changed his mind in regard to two deeds covering land that had been given to me personally, and he intended that this land should be given to me, and that I should share in his estate equally with the other three heirs. Q. State whether or not you have searched for this paper. A. I have time and again. Q. In the safe where you usually kept papers? A. Yes, sir. Q. Have you searched in every place that you ever kept any such papers? A. Yes, sir. Q. Have you exhausted every means of finding that paper? A. I have."

The witness gave other testimony touching the loss of the paper. Thereupon, the plaintiff cross-examined this witness touching the possession of the paper which he claimed to have, its date, where he got it, and then proceeded as follows:

"You state that you got that paper before you went to the house? A. No, sir. Q. Did you learn anything about it? A. I asked grandfather to give me a paper of that kind before we went to the house. Q. You asked him to give you the paper? A. Yes, sir. Q. Was the paper in pencil or ink? A. In ink. Q. Who wrote it? A. A. W. Harlan. Q. Did he write it that day? A. Yes, sir, that day. Q. At the house? A. At the house. Q. After you went to the house? A. Yes. Q. You say you were present, and your wife and mother? A. Yes. Q. And you had it ever since? A. I had it in my possession until 1910. That was the last time I saw it."

Then he proceeded on cross-examination to state the

contents of the paper substantially as set out on his direct examination, and he was asked this question:

"That is what the paper said? A. That I should share equally with the other heirs. Q. Is that all that was in it? A. Practically all. I don't think it was signed before a notary public. The only name on the paper was A. W. Harlan."

1. WITNESSES: competency: transaction with deceased: inferable facts.

If we concede that, under the rule laid down in *McElhenney v. Hendricks*, 82 Iowa 657, followed in *Campbell v. Collins*, 152 Iowa 608, and other cases, Mark T. Harlan was competent, nothwithstanding the provisions of Section 4604, to testify that he had a paper in his possession after the summer of 1904, made with reference to his interest in his grandfather's estate; that this paper was in his grandfather's handwriting; that it was given to him by some-one; that it was not given to him by any person other than A. W. Harlan,—a concession difficult to make, even under these authorities,—we still believe that the witness went beyond the limit of these authorities, and directly violated the inhibition of the statute when he stated, or attempted to state, the contents of the instrument so held by him. The evidence leading up to the giving of the contents of the instrument, under the rule laid down in the *McElhenney* case, can only be justified on the theory that the statute does not exclude proof of facts from which, by inference, other facts may be found, even though the fact found by inference be a fact to which the witness is not competent, under the statute, to testify to directly. In the *McElhenney* case, it was said:

"The question and answer expressly exclude any personal transaction between the plaintiff and the deceased."

The same is attempted here. The inference to be drawn, if it has any probative force at all upon the issues tendered here, is that the plaintiff received from his de-

ceased grandfather a written instrument touching his interest in his grandfather's estate, to be effectual upon the death of his grandfather. Assuming that the facts proven justified such an inference, the contents of the instrument are not inferable from the facts proven. The contents of the instrument involve a communication made by the grandfather to this grandson, touching his purpose and wish in the disposition of his estate after his death, in so far as it affected the grandson. This was purely a personal transaction or communication, and came within the inhibition of the statute. This incompetent witness was called upon and allowed to state, over objection, the contents of this communication. This was clearly within the inhibition of the statute, and cannot be considered by us in this case, triable *de novo* here.

2. DESCENT AND DISTRIBUTION: advancements: cancellation agreement: sufficiency of evidence.

But three witnesses were called who testified to the contents of this instrument, although it appears that there were others who were equally cognizant of its contents, if such instrument existed. These other witnesses were the mother and father-in-law of Mark. George Ray, the father-in-law, testified that he was 65 years old; that Mark married his daughter; that they (meaning Mark and his daughter) were at his house, the winter of 1904; that while they were there, he saw a paper in their possession purporting to be signed by A. W. Harlan; that he read the paper; that it was shown to him by his daughter; that he thought the paper stated like this: That he had changed his mind in regard to the land that he had deeded to Mark, and he intended that as a gift, and intended later for Mark to get his equal share of his property. He further testified that he had no knowledge about the paper except that his daughter handed a paper to him and he read it; that old man Harlan's name was signed to it; that he had six children at home, the oldest 39 years of age; that he

was not the only one the daughter showed the paper to; that she passed it around and they looked at it; that he thinks his wife and oldest daughter read it; that she took it out of her pocket and handed it to him, and he gave it back to her. He further testified that he did not know Mr. Harlan's handwriting, and does not know whether this paper shown to him was in Harlan's handwriting or not. He further testified that his attention was not called to the existence of this paper since the fall of 1904, until the fall of 1912 or 1913.

The other witness, Mrs. Saltzgaber, testified that the deceased came to her house on election day, 1904; that she remembered his making out a paper; that she saw the paper, read it, saw him write it; that she knew his handwriting, knew his signature; that this paper that she refers to was in his handwriting, and has his signature. She further testified that at the time the deceased said to her that Mark should have more; that the land that he had given him was not enough; that he should have an equal share with the other children; that he told her this frequently before this time; that, after the paper was written, she read it; that the old man handed it to Mark, and Mark handed it to the wife; that she and the wife read it over to see what disposition he was going to make of the land; that the paper stated that he had charged Mark with the land that he had given him, and he wanted Mark to have all—he was going to give that to him as a gift; and that he would share equally with the others in the distribution of the land when he was dead. She further testified that she knew nothing of the paper since that time; that her attention was not called to the fact again until 1913.

This is practically all the testimony, competent and incompetent, offered by the intervener to support his contention that, after the making of the deeds, Mark received an instrument modifying the terms of the deeds, in so far as

the deeds released the estate from any claim on the part of Mark to share in the balance left at the time of the death of A. W. Harlan. According to the testimony of these witnesses, this paper evidenced the fulfillment of a promise frequently made prior to its execution. It was a paper that Mark evidently recognized the need of if he would participate in his grandfather's estate after his death, a paper he desired and prized, and, if his contention be true, secured for the purpose of enabling him to hold not only the property deeded to him in the deeds hereinbefore referred to, but also one fourth of all the property that remained at the time of his grandfather's death.

It is claimed that this instrument was lost. The proof offered in support of the contention that it is lost is very unsatisfactory. Mark Harlan claims that, upon the execution of the instrument, he gave it to

3. EVIDENCE:
best and sec-
ondary: loss of
writing: suffi-
ciency of
showing.

his wife for safe-keeping. If the testimony of Ray relates to this instrument, it was in the possession of Mark's wife after its execution. There is no direct testimony that she ever parted with the possession. She was not called as a witness. The manner in which it is claimed the instrument was kept, the care taken of it, suggests a loose and careless, method of preserving valuable papers. The evidence as to the loose manner in which it was kept possibly aids the suggestion that it is lost. It does not appear that any other instruments from the same receptacle were lost; that the receptacle was mislaid. No reason is suggested why, if placed in the receptacle, it should have disappeared therefrom. It is not shown that anyone who was interested in suppressing it had access to the receptacle. No one seems to have thought of it or talked of it since it is claimed the instrument was made.

Mrs. Saltzgaber is really the only competent witness to the making of this paper and its contents. She is the moth-

er of Mark. She testifies that, away back when the deeds were made, Mr. Harlan had expressed a purpose to do what it is claimed this instrument does; that, during all the intervening years, he had frequently and persistently invited her attention to the fact that he intended to give Mark more than the property conveyed in the deeds; that he had frequently and persistently discussed the matters with her. Her testimony, if believed, tends to show a fixed purpose in the mind of Mr. Harlan to do what, by this instrument, it is claimed he did. We must either accept or reject her testimony. If not true in part, it possibly is not true at all. This case is triable *de novo* here. We must weigh the evidence and judge of the credibility of the witnesses. As against this, we have in the record the testimony of several witnesses who were closely related to A. W. Harlan during his lifetime, to the effect that, on the 29th day of August, 1904, a little over a month prior to the time when it is claimed this revoking instrument relied upon by the intervener was executed, A. W. Harlan executed the following instrument:

"Near Croton, Iowa, August 29, 1904.

"The instrument that I shall endeavor to write is what is meant to be in case of emergency a substitute for a will.

"Whereas, I have heretofore deeded to Mark Harlan, only heir of Justin B. Harlan, deceased, who was my son, the gift was made in two separate deeds, making in all about 100 acres lying in Van Buren Township, Lee County, Iowa, and he was informed on receiving the last deed that it was what I considered his full share of all my real estate. And that I hereby order and instruct my administrator that said Mark Harlan had already had his share of my estate.

"Confirmed by my usual business signature.

"A. W. Harlan.

"Witnesses: Eliza J. Watts, Eva South, Louisa O'Neil, John O'Neil."

Louisa O'Neil testifies that this paper was executed in her presence, and in the presence of the other witnesses; that Mr. Harlan drew it up, and asked her and the other witnesses to sign it as witnesses. One Sherman South, husband of the witness Eva South, testified that he saw the instrument above executed, and witnessed by the parties to it; that, at the time, he heard Mr. Harlan say that he had given Mark all he intended to give him of his estate; that he gave him 100 acres as his share of the estate; that, at another time, he told witness that the land was Mark's share. John O'Neil testified that he saw Harlan sign the paper. L. E. Williams testified that he surveyed A. W. Harlan's land in 1901; that, while he was surveying the land deeded to Mark, A. W. Harlan said that the 100 acres was for Mark's entire share of the estate, and the young man was present, and expressed gladness at the getting of it at that time.

It appears from the testimony of many witnesses that, during all the years intervening between the execution of the deeds conveying the land to Mark, and the death of A. W. Harlan, he had persistently and consistently said that his purpose and intention in executing the deeds to Mark was as expressed in the instrument dated August 29, 1904, and that the same was in full of any share that Mark might have as heir in the estate of A. W. Harlan. It is contended, however, that, conceding this to be true, A. W. Harlan may have changed his mind and executed the instrument claimed to have been executed on election day, 1904, and, even though he did have the purpose in his mind as expressed in the deeds and as exposed in the instrument of August 29th, yet this does not overcome the positive testimony that later he changed his mind, and executed the instrument relied upon by the intervener. This contention goes to the

real weight of the testimony, and involves the credibility
of the witnesses who have testified touching these matters.
    It is contended, however, that declara-
4. EVIDENCE: dec- tions of the testator as to intent and pur-
larations: as
showing intent pose are not competent as against his proven
and purpose on
issuable fact. act. This may be conceded, but still the
    question remains, Is it proven that he ex-
ecuted the instrument relied upon by intervener? Upon
this point, we have to say: When the record discloses that
an heir to an estate, or one who might be heir to an estate,
or who, in the event of death, would be, in law, entitled
to participate in the estate, releases to the ancestor all
right in the estate and accepts in advance a certain portion
of the ancestor's estate as a consideration for such release,
and the release and consideration are reduced to writing,
the party so releasing his interest is bound by such release.
If, after the death of the ancestor, he seeks to claim an in-
terest in the estate, based on the claim that, subsequent to
the execution of the original instrument under which he
released his interest in the estate, the ancestor changed his
mind touching his estate, and agreed and consented, in writ-
ing, that the claimant should not be bound by such release,
but should take the thing given in the original written in-
strument as a gift and retain it as such, and, upon his death,
share equally with the other heirs in the estate, and the sec-
ond instrument, releasing him from the original contract,
is claimed to be lost, is not produced upon the trial, a ques-
tion arises as to whether the ancestor did change his mind
and did execute the second instrument. It then is impor-
tant and necessary to inquire into the state of the ances-
tor's mind touching the subject matter of the controversy
at all times since the execution of the original instrument,
as bearing upon the probability of his having changed his
mind as alleged, and of his having executed the second
written instrument releasing the heir from the obligation

of the first. When it is conceded that the first instrument took from the plaintiff a right which, under the law, he was entitled to, when it is conceded that he surrendered the rights which, under the law, he was entitled to, and received from the ancestor a portion of his estate as a consideration therefor, and he seeks to show thereafter that the ancestor changed his mind touching the disposition of his estate, and consented that he should hold the property originally given as a gift, and share equally in the ancestor's estate upon his death with the other heirs, then the declarations of the ancestor which disclose his condition of mind touching the subject matter at all times subsequent to the time of the execution of the original instrument, may be shown as bearing upon the probability of his having changed his mind, and granted the claimant more than he was entitled to under the original instrument. All declarations of the ancestor up to the time of the execution of the second instrument, if any such instrument was executed, are competent to show the state of his mind, not for the purpose of defeating the second instrument, if executed, but as bearing upon the probability of the execution of the second instrument.

5. EVIDENCE: presumptions: inconsistent conduct: effect. Again, the record discloses that this instrument, executed on the 29th day of August, 1904, was presented for probate as the last will and testament of A. W. Harlan; that, upon the filing of said instrument, Mark T. Harlan appeared and protested against its admission to probate, and filed under oath his objections, asserting that, at the time the papers were supposed to be executed, A. W. Harlan was of unsound mind and memory; that he had not sufficient mental capacity to know of all the property which he possessed, or of all his relatives, or of those who were entitled to receive under and through him; that he was of unsound mind and memory; that he was un-

duly influenced to sign it. He said, among other things, that, at said time, A. W. Harlan did not have sufficient mental capacity to control his thoughts and intentions or acts or deeds, and that parties in interest, knowing of the weak condition of his mind, and taking advantage of the same, had him sign and execute the said paper without the said A. W. Harlan's knowing what he was doing at the time. This was in May, 1912. In May, 1911, in an action involving the estate of A. W. Harlan, Mark Harlan appeared. It was claimed that he was not entitled to participate, because of the deeds executed to him by A. W. Harlan. In the answer filed, he denied that in the deeds he gave a full release in and to all his claim against the estate of A. W. Harlan; denied that he ever covenanted or agreed to make no claims against the estate for his interest as an heir; denied that he accepted the deeds in full settlement of his claim; denied that he was barred by the deeds from making a claim; but nowhere did he make any reference to the existence of the instrument now relied on by his intervener, Baldwin. The suit now before us was commenced on the 11th day of March, 1912. In this suit he appeared, and filed substantially the same kind of an answer, and made no reference to the instrument now relied upon by the intervener. The intervener's petition was filed May 23, 1913, and this is the first time that the instrument relied upon by intervener is injected into the controversy. It appears strange that, in these two proceedings, with these deeds standing so convincingly in their proof against the claim that Mark is entitled to share in the balance of A. W. Harlan's estate, this alleged lost instrument should not have been mentioned, and it further seems strange and incredible that, with the knowledge of the lost instrument in his mind, if it ever existed, he should have gone on record as saying that, just about a month prior to the time when this lost instrument was alleged to be executed, A. W. Harlan was wholly mentally

incompetent to execute any instrument, or intelligently express himself as to the disposition he desired to make of his property. These considerations go to the weight of the testimony offered by intervener touching the existence of the alleged lost instrument. The attempted excuse for his silence is not convincing. Common experience teaches that men who possess written instruments involving valuable rights are not slow to urge the existence of these instruments when their rights are called into question. A failure to assert the existence of the instrument has strong persuasive force against a later claim that such instrument existed and was lost. Three instruments were produced upon the trial, executed and signed by A. W. Harlan, one on the 17th day of January, 1896, one on the 23d day of September, 1901, and one on the 29th day of August, 1904, and these negative the intervener's contention. Against these, we have the uncertain memory of those who say that they saw an instrument at variance with these instruments. This instrument they had never seen since the date of its execution, in November, 1904. Their attention was never called to its existence until some 8 or 10 years afterwards. Even Mark does not claim to have read the instrument later than the time of its execution, or to have examined it or discussed it with any of the parties who testified in his favor.

6. EVIDENCE: weight and sufficiency: inherent improbability.

It is urged that the testimony of Mrs. Saltzgaber is not disputed as to the execution and contents of this claimed lost instrument, but we think otherwise. She is contradicted by the facts and circumstances to which we have called attention. We may not disregard evidence, even though it be circumstantial, and perhaps inferential, which affects the probability or improbability, the reasonableness or unreasonableness of direct testimony. We are not bound by direct testimony, even though it is not

otherwise impeached or contradicted. Its inherent improb-ability may destroy it. Testimony is only to lead the mind to a knowledge of the truth. It is the weight of the evidence which turns the balance, whether that rest upon the testimony of facts and circumstances, negative or positive, or whether it rest upon direct testimony. All the circumstances disclosed in the record must be taken into consideration in weighing the testimony and giving it effect. Where the record presents solemn, written instruments, disclosing an intent and purpose on the part of the mind to do or not to do a particular thing, and that this purpose existed in the mind for a number of years, it would take a strong showing to satisfy the mind that, within one month after the last written declaration, the party had changed his mind, and did something diametrically opposed to all his formerly declared purposes.

No good purpose would be served by setting out the record in this case in full. We are satisfied from a careful reading of it that intervener has not carried his burden to a successful issue. We think the whole record negatives the claim that the instrument relied upon was ever executed by A. W. Harlan; that the written deeds stand as the true expression of the testator's mind and purpose with reference to Mark; that, in accepting the deeds with the provision, Mark released all claim to his grandfather's estate; and that the intervener is bound by such release.

In both appeals, the judgment of the court below is—*Affirmed*.

LADD, EVANS and SALINGER, JJ., concur.